508 A.2d 1287

Brady Contracting Co., Inc., Appellant *v.* West Manchester Township Sewer Authority and Columbia Gas of Pennsylvania, Inc., and Columbia Gas of Pennsylvania, Inc., and C. S. Davidson, Inc., Appellees.

Argued November 12, 1985, before Judges ROGERS and BARRY, and Senior Judge BLATT, sitting as a panel of three.

*Jeffrey W. Davis,* with him, *Thomas A. Beckley, Beckley & Madden,* for appellant.

*Lillian M. Morgan, Laucks & Monroe,* for appellee, West Manchester Township Sewer Authority.

OPINION BY JUDGE BARRY, May 6, 1986:

This is an appeal filed by appellant, Brady Contracting Co., Inc. (Brady) from a York County Court of Common Pleas order granting appellee, West Manchester Township Sewer Authority's (WMTSA) motion for summary judgment and dismissing Brady's claim for pecuniary damages.

Appellant submitted a proposal to WMTSA pursuant to WMTSA's advertisement for bids for installation of sewer lines and excavation. This project was called The Willis Run Interceptor-Phase III project. WMTSA accepted Brady's bid and awarded the contract

on April 7, 1981 which was entitled "Contract for Con-
struction". The contract price was $76,937.65. The
drawings upon which Brady based its bid were pre-
pared by Mr. Donald Resh, a private engineer
representing C. S. Davidson, Inc. Mr. Resh was the
project engineer employed by the WMTSA. His
drawings marked the location of the subsurface utility
lines and contained a stamp which read: "NOTE: Infor-
mation concerning underground utilities is not guaran-
teed to be complete or accurate. Contractor is responsi-
ble to contact all utility owners and to determine the
location of all underground utilities prior to excavation
by use of power operated equipment." The parties to
this action maintain that at a pre-construction site con-
ference on April 10, 1981, between Brady, Mr. Resh
and Columbia Gas Company officials, the utility
markings, as shown on the original drawings, were ei-
ther marked or confirmed.[1] In a follow-up letter to this
pre-construction site conference, Mr. Resh stated,
"Representatives of the utility companies, the contrac-
tor and the engineer reviewed on the site the markings
of the utility so that the markings were fully under-
stood. The existing utility should not interfere with the
proposed construction work under this contract." On
April 22, 1981, Columbia Gas again marked its gas
lines. It was discovered then that these new, more accu-
rate markings differed from the previous ones. To re-
solve the matter Columbia disconnected and then sev-
ered and removed the gas line at the point it conflicted
with Brady's proposed excavation plans. Brady began

---

[1] It should be noted that the factual question of whether Co-
lumbia Gas initially marked the utility lines' location on or before
April 10, 1981 or on April 22, 1981, is unresolved and is the exact
reason the trial court denied Columbia Gas' motion for summary
judgment.

performance on April 27, 1981, but, due to the alleged obstruction of the gas line, Brady claims that some redesign and reconstruction were required. Brady claims that this resulted in $34,684.10 of additional costs not originally contemplated when the bid was submitted. It attributed these costs to increased labor, materials and equipment. Brady notified WMTSA on May 6, 1981, in writing, about the conflict and its increased costs. In addition, Brady advised WMTSA that it would continue to work but demanded a written commitment from either WMTSA or Mr. Resh that it would be reimbursed for its additional costs, although it did not itemize its additional expenses. Written reassurance was never provided by either WMTSA or Mr. Resh. The record does indicate that on-going discussions between Brady and Mr. Resh took place throughout the project about Brady's increased costs and that Mr. Resh verbally recommended to WMTSA an extension of time to complete the project if one was so needed or requested, and a contract price increase. Brady contined work and was granted a certificate of substantial completion on June 4, 1981. On July 9, 1981, Brady, in a letter from its attorney, wrote to WMTSA stating the amount it was requesting, setting forth the reasons for its request and demanding arbitration pursuant to the contract. Brady again did not itemize its increased costs. Subsequent negotiations failed and Brady filed for damages in York County Court of Common Pleas. WMTSA and Columbia Gas were named as defendants and both moved for summary judgment. The York County Court of Common Pleas, the Honorable JAMES BUCKINGHAM presiding, granted WMTSA's motion but denied that of Columbia Gas. In granting WMTSA's motion, the trial court reasoned that the express contract terms in conjunction with Section 5 of the Act of December 10, 1974, P.L. 852, 73 P.S. §180 (Act 287), to which the

contract refers, placed the risk of loss resulting from mislocation of subsurface utility lines squarely on Brady. On appeal, Brady argues that any written agreement must be construed strictly against the party drafting it and that since neither the contract documents nor Act 287 contain provisions which place the risk of financial loss on the contractor, it should be reimbursed. Nor, it contends, does Act 287 require Brady to dig excavation pits to determine the exact location of the subsurface utilities. In addition, Brady argues that Mr. Resh's actions in recommending a price increase to WMTSA are binding on WMTSA under the terms of the contract, that it fulfilled all conditions precedent for timely notification of extra expenses under the contract and that whether it complied with the relevant section of the contract which requires "reasonable" actions on the part of the contractor is an issue of fact which, by its nature, should be resolved by a fact finder, thus, the motion for summary judgment was improper.

In addressing Brady's first argument, Brady contends that any written agreement must be construed strictly against the party who prepared it, that there were no provisions in these contract documents which specifically allocate financial responsibility for the location of utility lines after contract formation and, similarly, there are no provisions to the effect that the contractor covenants that there are no utility line conflicts. This, Brady contends, is sufficient to impose financial responsibility on WMTSA. Brady also argues that Act 287, on which the trial court relies, does not allocate financial responsibility and makes no mention of the risk of loss for the mislocation of subsurface utility lines. In addition, Act 287, says Brady, does not even require the excavation of test pits to verify utility locations. In effect, Brady is arguing that, because there are no express provisions in Act 287 or the contract specifically placing

the risk of financial loss on it, WMTSA should bear the costs. This argument, however, misses the point. The real issue is not whether Brady should be financially responsible for additional costs due to its reliance on Mr. Resh's estimate of utility locations but whether WMTSA should be financially responsible for Brady's increased expenses due to Brady's failure to adhere to the contract and related documents which pertained to the ascertainment of the exact location of the subsurface lines. A careful reading of the contract documents reveals that Mr. Resh's original drawings were stamped with the aforementioned "warning", that the contractor is responsible for determining the location of all underground utilites prior to excavation by use of power operated equipment. In addition, Section 6.08 of the supplementary contract conditions reads:

6.08 *Location and Construction Relative to Existing Utilities and Underground Structures*

The Contractor is cautioned to comply with the requirements of Pennsylvania Act 287, pertaining to excavation and/or demolition work near underground utility lines. Included in the Contract Documents is a list of all public utilities in the project area.

The Contractor is responsible for the necessary excavation of test pits as required to verify the location of utilities at no additional cost to the Owner.

Act 287 reads in relevant section:

180. Contractors, duties

It shall be the duty of each contractor who intends to perform excavation or demolition work at a site within a political subdivision:

(1) To ascertain the location and type of users' lines at such site, either by inspection of the designer's drawing made pursuant to section 4

or, if there be no such drawing, then by the same manner as that prescribed for a designer in clauses (1) and (2) of section 4.

The drawing documents and contract provisions show that WMTSA expected to be free from the financial responsibility of verifying utility locations and expected Brady to use heavy equipment to dig test pits to verify the locations of the utilities. It specified in the documents the method Brady was to employ. It would be unreasonable for us to assume that if WMTSA was relieved, under the terms of the contract, from financial responsibility for locating underground utilities that it could otherwise become financially responsible for complications arising from Brady's failure to ascertain the correct location of these lines, which was clearly Brady's responsibility under its agreement with WMTSA.

Brady maintains that, since Mr. Resh recommended a contract price increase to WMTSA, under Section 4.3 of the contract, he must have believed that Brady encountered a subsurface conflict materially different from that intended in the contract and that it could not have reasonably been foreseen. WMTSA is, therefore, it argues, bound by Mr. Resh's determination. We disagree. Section 4.3 of the contract reads:

Unforeseen Physical Conditions:

4.3 CONTRACTOR shall promptly notify OWNER and ENGINEER in writing of any subsurface or latent physical conditions at the site or in an existing structure differing materially from those indicated or referred to in the Contract Documents. ENGINEER will promptly review those conditions and advise OWNER in writing if further investigation or tests are necessary. Promptly thereafter, OWNER shall obtain the necessary additional investigations

and tests and furnish copies to ENGINEER and CONTRACTOR. If ENGINEER finds that the results of such investigations or tests indicate that there are subsurface or latent physical conditions which differ materially from those intended in the Contract Documents, and which could not reasonably have been anticipated by CONTRACTOR, a Change Order shall be issued incorporating the necessary revisions.

The record shows that Mr. Resh informed WMTSA that he could recommend an extension of time to complete the project if one was so needed or requested, and that Brady would be entitled to some additional compensation because of the expense it incurred. Mr. Resh testified that he instructed Brady in frequent discussions on this issue to submit its request for a change order if there was need for additional time and/or the right to compensation. This does not give rise to the inference that Brady had encountered legitimate and unforeseeable additional costs. In fact, it would be more reasonable to assume that, since Mr. Resh is authorized under Section 4.3 to issue a change order, if he believed the contractor had incurred reimbursable costs and never issued a change order, therefore, Brady was not entitled to a contract price increase. WMTSA is not bound by Mr. Resh's actions in this instance.

Brady argues that it met all the conditions under the contract for notification of events which justified a price increase. It claims that, since the actual total of additional expenses could not be calculated until the day performance was completed (June 4, 1981), his letter of May 6, 1981, fulfilled the fifteen day requirement of Section 11.2 and that his letter of July 9, 1981, fulfilled the forty-five day requirement of Section 11.2. Brady reasons that "the occurrence of the event giving rise to the claim" for the latter requirement was not one event

but an everyday, ongoing series of incurred costs. We must reject this argument.

Section 11.2 of the contract reads:

11.2 The Contract Price may only be changed by a Change Order. Any claim for an increase in the Contract Price shall be based on written notice delivered to OWNER and ENGINEER within fifteen days of the occurrence of the event giving rise to the claim. Notice of the amount of the claim with supporting data shall be delivered within forty-five days of such occurrence unless ENGINEER allows an additional period of time to ascertain accurate cost data. All claims for adjustment in the Contract Price shall be determined by ENGINEER if OWNER and CONTRACTOR cannot otherwise agree on the amount involved. Any change in the Contract Price resulting from any such claim shall be incorporated in a Change Order.

The language of Section 11.2 states "that an increase in the contract price shall be based on written notice delivered to owner and engineer within fifteen days of the occurrence of the event giving rise to the claim. Notice of the amount of the claim with supporting data shall be delivered within forty-five days of such occurrence unless Engineer allows an additional period of time to ascertain accurate cost data." Even if we characterize this event as one not having an identifiable date of occurrence, there is no indication that Mr. Resh extended additional time to Brady to ascertain costs as he is so authorized under Section 11.2 or that Brady, to date, has ever submitted adequate supporting data of its additional expenses despite the warnings of Mr. Resh. In addition, Brady never requested a change order under the express provisions of Section 11.2. We cannot agree that Brady has met the conditions precedent under the contract for reimbursement.

Brady argues that it was "trapped" between WMTSA's failure to provide written reassurance and the contract provision requiring it to continue to work in the face of a dispute or disagreement. The contract provision to which Brady refers is Section 6.29 which reads:

Continuing the Work:

6.29   CONTRACTOR shall carry on the Work and maintain the progress schedule during all disputes or disagreements with OWNER. No Work shall be delayed or postponed pending resolution of any disputes or disagreements, except as CONTRACTOR and OWNER may otherwise agree in writing.

This argument might have warranted closer consideration if Brady had made more of an effort to comply with Section 4.3 and 11.2 of the contract, Section 6.08 of the supplementary contract along with Act 287 and the contract documents since Section 6.29 could be interpreted to read that Brady is under an absolute duty to perform regardless of WMTSA's fulfillment of its contractual obligations. We have held that a contractor cannot be put in a position of having to proceed with additional work without the required authorization.

We believe that where, as here, written authorization from the contracting governmental authority is required before the contractor can recover for additonal work performed, the contractor is not required to perform such work absent the required authorization. Strict adherence to the contract provision involved here must apply equally to both parties.

*Dick Corporation v. State Public School Building Authority,* 27 Pa. Commonwealth Ct. 498, 501, 365 A.2d 663, 665 (1976). However, since Brady elected to proceed it was still under a duty to comply with the

provisions of the contract in regard to work and price changes. Since Brady ignored these provisions we need not address the "Catch 22" provisions of Section 6.29.

> It is a well-established rule of law that where, by the terms of a contract with a governmental body, written orders for additional work are required, the contractor cannot recover for extra work without compliance with the contractual provisions. . . . The basic rationale behind this rule is that such provisions prevent fraudulent and exorbitant claims for compensation for extra work and additional costs.

*Dick Corporation* at 500, 365 A.2d at 664-665 (citations omitted).

We must disagree with Brady's final argument that the issue of whether its failure to foresee the gas line conflict was reasonable, under Section 4.3 of the contract relating to unforeseen physical conditions, is a genuine issue of material fact which is improper for summary judgment under Pa. R.C.P. No. 1335(b) which reads:

> Rule 1035.   Motion for Summary Judgment
>
> . . . .
>
> (b)  The adverse party, prior to the day of hearing, may serve opposing affidavits. The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there *is no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issues of liability alone although there is a genuine issue as to the amount of damages. (Emphasis supplied.)

The relevant portion of Section 4.3 reads:

> If ENGINEER finds that the results of such investigations or tests indicate that there are subsurface or latent physical conditions *which differ materially from those intended in the contracts Documents, and which could not reasonably have been anticipated by CONTRACTOR,* a Change Order shall be issued incorporating the necessary revisions. (Emphasis supplied.)

Given our determination here that the subsurface utility conflict was Brady's responsibility under the contract terms and related documents, we do not feel Section 4.3 applies. The terms of the agreement between Brady and WMTSA anticipated this exact situation, therefore, the conditions encountered are not materially different from those intended.

Accordingly, we affirm the trial court's granting of WMTSA's motion for summary judgment.

### ORDER

Now, May 6, 1986, the order of the York County Court of Common Pleas No. 82-S-1376 dated December 7, 1981 which grants West Manchester Township Sewer Authority's motion for summary judgment is affirmed.